The order below is hereby signed.

Signed: September 30 2021



*Elizabeth L. Gunn*
U.S. Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF COLUMBIA

| | |
|---|---|
| **In re:** | Case No. 19-00042-ELG |
| **Tanner Scott Campbell,** Debtor. | Chapter 7 |
| **MoSex Exhibit 1, LLC,** Plaintiff | |
| v. | Adv. Pro. No. 19-10025 |
| **Tanner Scott Campbell,** Defendant. | |

## MEMORANDUM OPINION

On February 8, 2021, the Court conducted a trial on the remaining cause of action in the *Complaint* (the "Complaint") (ECF No. 1) filed by MoSex Exhibit 1, LLC ("MoSex") for a determination that the debtor Tanner Scott Campbell ("Debtor" and/or "Defendant") is not entitled to a discharge pursuant to 11 U.S.C. § 727(a)(3).[1] The Court concurrently tried MoSex's *Motion to Dismiss* the Debtor's main bankruptcy case pursuant to 11 U.S.C. § 707(a). Main Case, ECF No. 50. At the conclusion of the trial, the Court took the matters under advisement. For the reasons

---

[1] The Court originally set the trial for June 29, 2020. After three continuances, the trial was ultimately held on February 8, 2021.

discussed below, the Court will deny the Debtor a discharge. The Court will address the Motion to Dismiss in a separate Memorandum.

This Memorandum Opinion sets forth the Court's findings of fact and conclusions of law in accordance with Rule 7052 of the Federal Rules of Bankruptcy Procedure.[2] The Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(a) and 1334. This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A) and (J), in which final orders or judgments may be entered by a bankruptcy judge. Venue is appropriate in this Court pursuant to 28 U.S.C. § 1409(a).

## I. Procedural History

On July 22, 2019, MoSex filed the Complaint asking this Court, *inter alia*, to deny the Debtor's discharge. ECF No. 1 (listing five grounds for exemption from discharge or denial of discharge under 11 U.S.C. §§ 523(a) & 727(a)). On February 10, 2020, the Court dismissed all but one count of MoSex's Complaint, leaving the sole remaining count seeking a denial the Debtor's discharge pursuant to 11 U.S.C. § 727(a)(3). *See Mem. Dec. & Order*, ECF No. 20 at 11 ("Count IV remains pending with respect to the allegations of paragraphs 55, 56, 58, 59, and 61 of the complaint."), *amended by Am. Mem. Dec. & Order*, ECF No. 37 (Aug. 13, 2020). Accordingly, on July 20, 2020, the Defendant filed a *Motion in Limine*, ECF No. 30, seeking to exclude evidence he contended was irrelevant to the sole remaining count. On January 13, 2021, the Court entered an *Order Granting in Part, and Denying in Part Defendant's Motion in Limine to Limit or Exclude Evidence*, ECF. No. 109, excluding MoSex's Exhibit P16, *id.* at 5. The remaining exhibits, Mosex's Exhibits P1-P15 and P17-P55, and Defendant's Exhibits A-E, were admitted into

---

[2] Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate. *See* Fed. R. Bankr. P. 7052.

evidence at the consolidated trial[3] with the appropriate weight of the evidence to be afforded by the Court in each of the pending matters.[4]

## II.     Facts

The Debtor is an ivy-league educated individual with a Bachelor of Arts degree in history from Cornell University and a master's degree in real estate development from Columbia University. His primary area of expertise is in the hospitality (primarily food and beverage) and associated real estate development industries. At all relevant times, the Debtor worked as a salaried employee in the food service/hospitality industry at the executive level. He also maintained a side consulting business in the same industry. In addition, the Debtor was a member of at least one LLC in the industry – Swimmers New York, LLC ("Swimmers") – which is the basis for most of the debt that the Debtor seeks to discharge in his chapter 7 case.

On or about July 31, 2015, Swimmers entered into a commercial lease with MoSex for restaurant space in New York City (the "Lease"). *See* Pl.'s Ex. 28, at 3. Concurrently, the Debtor signed a personal guaranty of the Lease (the "Guaranty"). *See* Pl.'s Ex. 29. Under the terms of the Lease, possession of the premises was granted in August 2015, but Swimmers' first rental payment was not due until December 2015. The first rental payment was never made. Shortly after the payment default, MoSex began proceedings to terminate and enforce the terms of the Lease and the Guaranty against both Swimmers and the Debtor in the Supreme Court of the State of New

---

[3] The trial was held remotely due to the ongoing COVID pandemic, and the parties were directed to file their exhibits in the docket ahead of the trial. MoSex's Ex. P3 was not filed in the adversary proceeding docket. However, Ex. P3 as well as an Ex. P56 were filed in the main case. Case No. 19-00042-ELG, ECF. No. 121. For simplicity's sake, Case No. 19-00042-ELG will hereafter be referred to as the "Main Case," and Case No. 19-10025-ELG will be referred to as the "Adversary Proceeding." But unless specified otherwise, all docket citations are to the Adversary Proceeding.

[4] Because this Court held a consolidated hearing, this Court heard testimony and admitted evidence far broader in scope than the findings included herein. However, because the instant Memorandum turns on a much narrower set of facts than those relevant to the pending Motion to Dismiss, the background herein is limited to findings of fact relevant to § 727(a)(3).

York, County of New York (the "New York Court"). *See generally* Pl.'s Exs. 3, 4, 6-10 (various New York Court litigation documents).[5] On September 8, 2016, the New York Court granted summary judgment in favor of MoSex against the Debtor with respect to his liability under the Lease and Guaranty in *MoSex Exhibit 1 LLC v. Campbell*. Pl.'s Ex. 6. On May 11, 2017, the New York Court followed the summary judgment decision with entry of a judgment order against the Debtor in favor of MoSex in the principal amount of $431,127.00, plus $165,000.00 in attorneys' fees, and $49,431.96 of pre-judgment interest on the principal amount from February 1, 2016, for a total judgment of $645,558.96 (the "Judgment"). Pl.'s Ex. 9.

In November 2017, MoSex registered the Judgment in the District of Columbia Superior Court (the "Domestication"). Pl.'s Ex. 10. After numerous attempts at service of subpoenas for the examination of the Debtor, service was finally affected on September 28, 2018 and the Debtor appeared for examination on November 2, 2018. Pl.'s Ex. 11. On December 21, 2018, MoSex issued a Writ of Attachment to the Debtor's then-employer, which was served on January 8, 2019 (the "Wage Garnishment"). Pl.'s Ex. 12.

Shortly after service of the Wage Garnishment, on January 16, 2019, the Debtor filed his chapter 7 petition in this court. *See* Debtor's Pet., Main Case, ECF No. 1. The Debtor's statements, lists, and schedules were filed in conjunction with the voluntary petition. On April 19, 2019, MoSex filed its Motion to Dismiss the Debtor's chapter 7 case. Main Case, ECF No. 18, *amended by* ECF No. 50 (May 31, 2019). Three months later, on July 22, 2019, MoSex filed its Complaint, ECF No. 1, initiating this adversary proceeding. The Motion to Dismiss and Complaint each raise

---

[5] There was significant litigation in the Supreme Court of the State of New York, County of New York. The Court does not attempt to detail the entirety of those proceedings, just the orders relevant to this adversary proceeding. In addition, at substantially the same time, the Debtor, through Swimmers, commenced proceedings against the MoSex for claims including but not limited to breach of the Lease in the New York Court. That action was ultimately dismissed when the Debtor failed to comply with an order of the New York Court.

the issue of the Debtor's significant earnings, spending, lifestyle, business habits, and candor—alleging that the Debtor has the means to satisfy his debts, but has failed to do so by maintaining imprudent expenses and by failing to maintain adequate personal and business financial records, and further alleging that he made false statements as to payments, transfers, and expenses, and provided incomplete accounting of significant bank withdrawals.

The basis for the remaining count in the Complaint, contending that discharge should be denied under § 727(a)(3)—for failure to maintain or keep records from which the Debtor's financial condition might be ascertained—was first raised in the MoSex's Motion to Dismiss, which also questioned the size, source, and disposition of the Debtor's ATM cash withdrawals. *See* Main Case, *Mot. to Dismiss* ¶¶ 10, 42, 55-59, ECF No. 50, at 7, 16, 19-20. The Debtor's ATM withdrawals exceeded $200,000.00 for the period January 6, 2015 to May 6, 2019. Pl.'s Exs. 17, 18A, 18B. Over the fifty-two (52) month period of January 2015 through May 2019, the $3,156.85 monthly budget surplus the Debtor reported in his Schedule J, Main Case, ECF No. 1, at 27, would equal approximately eighty-two percent (82%) of the total ATM withdrawals during that period.[6] The time period includes $12,740 in withdrawals in nearly four months post-petition (January 16, 2019 – May 6, 2019); however, the information is included and relevant as there is no evidence of any modification or curtailment of the Debtor's ATM usage or budget after the filing of his chapter 7 petition. *See* Pl.'s Ex. 17; *see also* Main Case, *Mot. to Dismiss* ¶¶ 32-33, ECF No. 50, at 11-12 (showing how more prudent expenses would increase the Debtor's surplus enough to pay most of the creditors' claims within five years). In addition, the Debtor did not provide any further

---

[6] The percentage is calculated as follows: 52 months x $3,156.85 surplus/month = $164,156.20 = 82.1% of $200,000 (ATM cash withdrawn). MoSex contends that the Debtor has inflated his scheduled taxes and other expenses so that his actual and potential surpluses are much larger. *See* Main Case, *Mot. to Dismiss* ¶¶ 23-29, ECF No. 50, at 10-11.

explanation as to the use or location of the remaining approximately 18% of his reported budget surplus.

The Debtor's individual ATM withdrawals followed a pattern of almost daily withdrawals in the low hundreds of dollars, frequently multiple times a day. *See* Pl.'s Ex. 17 (Spreadsheet of Debtor's Bank Transactions). For example, in October 2016, the Debtor withdrew $7,600.00 from ATMs in 38 different transactions—including $820.00 in 5 transactions on October 3, 2016. Pl.'s Ex. 17, at 9-10 of 20. A year later, in October 2017, the Debtor withdrew $5,100.00 from ATMs in 23 different transactions—including $900.00 in 5 transactions on October 10, 2017, Pl.'s Ex. 17, at 15-16 of 20, and between January 16, 2019 and May 6, 2019, the Debtor withdrew $12,740.00 from ATMs in 56 different transactions, Pl.'s Ex. 17, at 19-20 of 20.

In addition to the cash withdrawals, the Debtor also had a debit card for the same account that he used interchangeably with the cash, depending upon convenience, though without any apparent other pattern of usage. *See*, *e.g.*, Pl.'s Ex. 18A, at 190-91 of 200 (showing 8 debit card purchases, 5 ATM withdrawals, and 1 bill payment on Oct. 3, 2016); Pl.'s Ex. 18B, at 190-91 of 241 (showing 10 debit card purchases, 4 ATM withdrawals, and 1 bill payment on Oct. 9, 2018). Despite the frequent and extensive number of cash withdrawals, at trial, the Debtor could not provide any detail for the disposition of the withdrawals, including those made within close proximity in time and/or location to debit card purchases—which may have provided location or context information. Further, while the Debtor's testimony provided high-level explanations for his *pattern* of ATM withdrawals, he was unable to provide any specificity as to any one withdrawal or to the purpose and recipients of any the withdrawn cash. The Debtor's explanation was that the cash was frequently, but not exclusively, used for either business expenses and/or market research for his consulting business and/or his salaried employer. At other times cash was used to pay for

clearly personal expenses such as groceries. Finally, cash was used for expenses such as meals or transportation that might have a mixed characterization. Regardless of the characterization, the Debtor could not provide a single receipt or point to a single, specific amount and purpose for any of the withdrawals for business expenses or otherwise.

In summary, the Court finds that the Debtor's spending and cash managements practices, the apparent intertwining of his business and personal expenses, and his lack of records or explanation as to the purpose and disposition of his extensive cash disbursements and other payments was such that the Debtor was unable to recall or ascertain the details of his financial condition and prepetition business transactions. Further, the Debtor's explanations for his failure to maintain any records was, at best, incongruent with his educational and business background. Since the Debtor is unable to recall the necessarily relevant information and details, it renders it difficult if not impossible for creditors to determine the particulars of his transactions in order to ascertain the Debtor's financial condition as required by the Bankruptcy Code.

### III.    Analysis

Under chapter 7 of the Code, a debtor should be denied a discharge where:

> the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case . . . .

11 U.S.C. § 727(a)(3). Thus, it is a precondition to discharge that a debtor must afford creditors, the trustee, and the Court with sufficient information to ascertain, examine, and understand the debtor's business and finances. *See In re Juzwiak*, 89 F.3d 424, 427-28 (7th Cir. 1996) (quoting *Bay State Milling Co. v. Martin* (*In re Martin*), 141 B.R. 986, 995 (Bankr. N.D. Ill. 1992); *FDIC*

*v. Kottwitz* (*In re Kottwitz*), 42 B.R. 566, 569 (Bankr. W.D. Mo. 1984) (citing *Citizens Bank of Winigan v. Borron* (*In re Borron*), 29 B.R. 122, 127 (Bankr. W.D. Mo. 1983)).

In considering whether to deny a debtor a discharge under § 727(a)(3), the plain language of the Bankruptcy Code requires the Court to conduct a two-part analysis. First, the initial burden lies with the creditor to show that the Debtor, through act or omission, failed in his duty to keep, preserve, and afford sufficient records. *See Sloan v. Allen* (*In re Allen*), 572 B.R. 440, 457 (Bankr. D.D.C. 2017) (quoting *D.A.N. Joint Venture v. Cacioli* (*In re Cacioli*), 463 F.3d 229, 235 (2d Cir. 2006)); *accord Graham Mortg. Corp. v. Goff* (*In re Goff*), 579 F. App'x 240, 241 (5th Cir. 2014) (quoting *The Cadle Co. v. Duncan* (*In re Duncan*), 562 F.3d 688, 697 (5th Cir. 2009)); *Davis v. Wolfe* (*In re Wolfe*), 232 B.R. 741, 745 (B.A.P. 8th Cir. 1999) (citing *Anderson v. Wiess* (*In re Wiess*), 132 B.R. 588, 592 (Bankr. E.D. Ark. 1991)). If the creditor makes this showing, the burden then shifts to the debtor to show an adequate justification or excuse for the failure under the circumstances of the case, such that a discharge is still warranted despite the failure. *See Goff*, 579 F. App'x at 242 (quoting *In re Duncan*, 562 F.3d at 697); *Turoczy Bonding Co. v. Strbac (In re Strbac)*, 235 B.R. 880, 883 (B.A.P. 6th Cir. 1999) (quoting *United States v. Trogdon* (*In re Trogdon*), 111 B.R. 655, 658 (Bankr. N.D. Ohio 1990)); *Wolfe*, 232 B.R. at 745 (citing *Wiess*, 132 B.R. at 592).[7] As set forth below, the Court finds that MoSex has met its burden under § 727(a)(3) to show that the Debtor failed to maintain adequate records and, under the circumstances of this case, the Debtor has failed to justify that failure.

---

[7] Some courts have criticized standards that conflate or combine standards for the two parts of the analysis. *See Cacioli*, 463 F.3d at 236 (quoting *Strzesynski v. Devaul (In re Devaul)*, 318 B.R. 824, 831 (Bankr. N.D. Ohio 2004)). This Court agrees and has found it useful to separate elements of such standards for use within the appropriate part of the analysis.

> A.  **MoSex has shown that the Debtor failed to keep, preserve, and afford sufficient records to portray his financial condition and business transactions.**

The standard under § 727(a)(3), to gauge the sufficiency of information maintained by a debtor, "is whether there is available written evidence made and preserved from which the present financial condition of the bankrupt, and his business transactions for a reasonable period in the past may be ascertained." *Mercantile Peninsula Bank v. French* (*In re French*), 499 F.3d 345, 355 (4th Cir. 2007) (quoting *Meridian Bank v. Alten*, 958 F.2d 1226, 1230 (3d Cir. 1992)). "The Bankruptcy Code does not demand perfection, but it does require debtors to maintain records in a manner that is reasonable under the circumstances of the particular case." *Id.* (quoting *Consumers United Capital Corp. v. Greene* (*In re Greene*), 202 B.R. 68, 71 (Bankr. D. Md. 1996)); *see also Davis v. Wolfe* (*In re Wolfe*), 232 B.R. 741, 745 (B.A.P. 8th Cir. 1999) (quoting *First State Bank of Newport v. Beshears* (*In re Beshears*), 196 B.R. 468, 474 (Bankr. E.D. Ark. 1996)) ("The debtor is required 'to take [reasonable] steps . . . to enable the creditors to learn what he did with his estate.'"). A record keeping manner is reasonable if it conforms to the customary recordkeeping practices of a "reasonably prudent debtor" with a comparable "occupation and financial structure." *See Wynn v. Wynn* (*In re Wynn*), 205 B.R. 97, 101 (Bankr. N.D. Ohio 1997); *accord State Bank of India v. Sethi (In re Sethi)*, 250 B.R. 831, 838 (Bankr. E.D.N.Y. 2000). Thus, the case-by-case determination of what manner of recordkeeping is "customary," and therefore "reasonable," hinges on the "size, complexity, and nature of the debtor's business" and those of "the debtor's obligations." *Clean Cut Tree Serv., Inc. v. Costello* (*In re Costello*), 299 B.R. 882, 897 (Bankr. N.D. Ill. 2003); *Sethi*, 250 B.R. at 838. Courts may consider, on a case by case basis, whether to permit a debtor's testimony, or other non-contemporaneous information afforded by a debtor, to cure deficient contemporaneous written records. *See Neugebauer v. Senese* (*In re Senese*), 245

B.R. 565, 576 (Bankr. N.D. Ill. 2000) ("the Debtor's failures in record keeping" and paucity of his "testimony which might . . . have been the equivalent of that information"). *But see Sethi*, 250 B.R. at 839 (quoting *Aid Auto Stores, Inc. v. Pimpinella* (In re *Pimpinella*), 133 B.R. 694, 698 (Bankr. E.D.N.Y. 1991)) (disapproving of "oral testimony [to] supplement that information which is absent from the actual records"). The creditor's showing that a debtor has breached this duty is necessarily a lenient standard since "the burden is not on the creditor to organize and reconstruct the debtor's business affairs." *Juzwiak*, 89 F.3d at 429.

As in this case, where an individual's business and personal finances are intertwined, a debtor's disclosure duty extends to his closely held business's records in addition to his own. *See Protos v. Silver* (*In re Protos*), 322 F. App'x 930, 935 (11th Cir. 2009) ("Appellant failed to preserve certain records . . . for corporations in which he was a shareholder."); *Cacioli*, 463 F.3d at 235 ("[T]he Debtor failed to maintain personal . . . and partnership records from which his financial condition and business transactions might be ascertained."); *Hussain v. Malik* (*In re Hussain*), 508 B.R. 417, 424-25 (B.A.P. 9th Cir. 2014) (finding debtor ought to have produced records of gas station he owned and operated); *Gray v. Jackson* (*In re Jackson*), 453 B.R. 789, 798 (Bankr. E.D. Pa. 2011) (citing *Wachovia Bank, N.A. v. Spitko* (*In re Spitko*), 357 B.R. 272, 307 (Bankr. E.D. Pa. 2006)) ("[T]he debtor's disclosure requirement [may extend] to the books and records of a closely held corporation."). The Debtor was employed at different times, including on the Petition Date, as a salaried employee in his primary industry (food service/hospitality) and at trial consistently identified the purpose and use of the cash withdrawals as "business expenses" for "market research, entertainment, hosting, and building relationships" without any ability to identify or provide any more detailed description of even one specific instance of the same. However, it is clear that the Debtor's personal connections and insights into the industry—for the

benefit of both his employer at the time as well as his own consulting firm—were key assets he sought (and expended significant funds) to develop. Thus, the Debtor had an obligation to maintain and produce records of both his personal and business expenses in order that his financial condition and business transactions might be ascertained.

Further, despite the issues raised by the MoSex in the Complaint, the Debtor did not produce or file any document (such as an amended Schedule J) to provide any further details for the cash spent in his budget. When given the opportunity to provide oral testimony at trial, the Debtor did not, or could not, indicate where or how those funds were spent other than in grand generalizations. Thus, the disposition of cash constituting roughly one fifth of the Debtor's gross pre-petition income (or one third of his scheduled income after taxes) has not been accounted for by the Debtor in this case, other than his acknowledging that he withdrew and then spent the cash.

The Court allowed significant opportunities for the Debtor supplement the lack of written records with testimony at trial, but he did not. In addition, Debtor might have overcome the failure to maintain adequate records if he had adequately included and disclosed a complete record of his spending in his bankruptcy schedules (disclosure necessary for analysis by the chapter 7 trustee, United States Trustee, creditors, etc.), but he did not. There is simply no written documentation as to how the ATM cash was disposed of, and only very general testimony. Without adequate records and disclosures as required by the Bankruptcy Code, it is possible the Debtor made pre-payments recoverable as preferences, fraudulent conveyances, or other recoverable transactions that could be administered for the benefit of his creditors. *See Hussain*, 508 B.R. at 425. Even though the size, nature, and complexity of the Debtor's business may well be consistent with a relatively modest degree of financial recordkeeping and accounting, the Debtor has failed to meet even that modest burden here. Given the nature of the Debtor's business, it is reasonable to expect that he

would have maintained documentation sufficient to identify and distinguish his personal and business expenses. Further, the size and nature of the Debtor's obligations suggests that more than just a modest degree of documentation could reasonably be expected here, to enable creditors to determine precisely what the Debtor did with his significant income. While very modest records may be reasonable for a simple sole proprietorship with few obligations, a business that (1) operates significantly with cash, that (2) has expenses indistinguishable from and intertwined with personal expenses, and that (3) has or can be expected to have substantial obligations must have more detailed accounting documentation than the complete dearth of any records Debtor has maintained here. *See Wolfe*, 232 B.R. at 745; *Wynn*, 205 B.R. at 101; *Costello*, 299 B.R. at 897; *Sethi*, 250 B.R. at 838.

Therefore, the Court finds that the Debtor failed to present "written evidence made and preserved from which the present financial condition of the [Debtor], and his business transactions for a reasonable period in the past may be ascertained." *In re French*, 499 F.3d at 355 (quoting *Meridian Bank*, 958 F.2d at 1230). Accordingly, the Court finds that MoSex has successfully shifted the burden of persuasion to the Debtor to justify this failure.

**B. The Debtor has failed to show that his failure to adequately document the disposition of his ATM cash withdrawals was justified under all of the circumstances of this case.**

Since MoSex has shown that the Debtor failed to maintain adequate records, the burden shifts to the Debtor to justify the failure in order to be entitled to a discharge under chapter 7. *See Meridian Bank*, 958 F.2d at 1234.[8] Thus, the Debtor must show that despite his failure to keep adequate records, he should still be entitled to a discharge "under all of the circumstances of the

---

[8] There are several multi-factor tests used by courts to consider both the adequacy of the information produced by a debtor and a debtor's justification failing to produce adequate financial records. *See, e.g.*, *State Bank of India v. Sethi (In re Sethi)*, 250 B.R. 831, 838 (Bankr. E.D.N.Y. 2000) (citations omitted).

case." 11 U.S.C. § 727(a)(3). In other words, the failure may be justified to the extent that the Debtor can satisfy the Court that, in light of the specific facts and circumstances of his case, he "was not in duty bound to keep" the absent or deficient records—i.e., that holding the Debtor to such duty here would not be equitable. *See Meridian Bank,* 958 F.2d at 1232 (quoting *White v. Schoenfeld*, 117 F.2d 131, 132 (2d Cir. 1941)). In this regard, the Debtor must show that the failure was reasonable under the circumstances. *See Razzaboni v. Schifano* (*In re Schifano*), 378 F.3d 60, 70 (1st Cir. 2004); *see also Meridian Bank*, 958 F.2d at 1231 (quoting *Milam v. Wilson* (*In re Wilson*), 33 B.R. 689, 692 (Bankr. M.D. Ga. 1983)) ("what a normal, reasonable person would do under similar circumstances"). The standard is a fact-intensive inquiry based upon the unique nature of each case. *See Grey v. Jackson* (*In re Jackson*), 453 B.R. 789, 801 (Bankr. E.D. Pa. 2011). When evaluating the debtor's explanation, the Court will consider the debtor's "education, experience, and sophistication," other relevant personal factors and those of his business, "and any other circumstances that should be considered in the interest of justice." *See Meridian Bank*, 958 F.2d at 1231 (quoting *Wilson*, 33 B.R. at 692); *Schifano*, 378 F.3d at 70 n.3 (quoting *Meridian Bank*, 958 F.2d at 1231).

As already stated, despite ample opportunity to do so, the Debtor has offered little explanation for his failure to maintain any type of records or documentation regarding the disposition of the cash he withdrew from his account before *and after* filing his chapter 7 petition while also having, and at times using, a debit card.[9] Debit card or bank statements might be sufficient to satisfy a writing requirement even without additional recordkeeping on behalf of a debtor, as they create a record maintained by the financial institution. *See Allen*, 572 B.R. at 457-

---

[9] At trial, the Debtor stated that he would use cash in lieu of his debit card at a restaurant when he did not want to wait for the check.

58. But ATM withdrawals require additional documentation as they are much more like missing cash from a register than a series of receipts detailing when and how the money was spent. *See Noland v. Johnson* (*In re Johnson*), 387 B.R. 728, 737-39 (Bankr. S.D. Ohio 2008) (denying discharge due to cash transactions where the debtor "was only able to provide vague explanation and no documentation"); *Spitko*, 357 B.R. at 310-12 (rejecting justification for undocumented disposition of cash withdrawals); *Sackett v. Shahid* (*In re Shahid*), 334 B.R. 698, 708 (Bankr. N.D. Fla. 2005) (finding no justification for cash transactions made without sufficient records). In testimony, the Debtor was only able to offer vague generalities and implied that his spending (and lack of saving) habits were the product of his education, and simply the way he lived. The Debtor's suggestion that his spending was part of developing his business knowledge or was part of his consulting business does not exempt him from a requirement to maintain or produce records as to the cash used for those purposes in this individual case, especially when the withdrawals were not a *de minimis* part of his total income. To hold otherwise "would allow a closely held business to work as a shield, protecting relevant information 'behind the veil of the corporate façade.'" *U.S. Tr. v. Kandel* (*In re Kandel*), No. 12–6003, 2015 Bankr. LEXIS 790, at *28 (Bankr. N.D. Ohio Mar. 13, 2015) (quoting *Blanchard v. Ross* (*In re Ross*), No. 98-00246, 1999 WL 10019, at *5 (Bankr. E.D. Pa. Jan. 4, 1999)). The Debtor himself testified that his finances are commingled with his business ventures and that he exerts significant—if not sole—control over his ventures. *See also Kandel*, 2015 Bankr. LEXIS 790, at *29; *accord Vulcan Constr. Materials, LP v. Kibel (In re Kibel)*, No. 10-51397, 2011 WL 1042575, at *11-12 (Bankr. W.D. Tex. Mar. 15, 2011); *CM Temp. Servs. v. Bailey (In re Bailey)*, 375 B.R. 410 (Bankr. S.D. Ohio 2007). Even though the Debtor was able to provide a generalized substantive basis for *why* he withdraws such significant

quantities of cash from ATMs, he did not provide sufficient evidence or testimony to justify his failing to keep any type of records about *how and where* he spent that cash.

The Debtor explained at trial that some cash transactions were tips to restaurant staff, for which receipts are not customary. He further explained that he did not know that he needed to maintain records for his cash transactions, and that he was not good at recordkeeping. These explanations are not reasonable justifications for the lack of records in light of the size and number of the cash transactions at issue—on average over $4,000.00 per month, at an average of over $130.00 per day, for four years. The Court does not find it at all plausible that the Debtor utilized cash in the extraordinary high quantities found in this case solely for transactions in which receipts or records would not normally be provided. Nor do these explanations constitute justifications that render the failure equitable to creditors. Creditors in the position of MoSex can reasonably expect to see fuller, credible documentation of cash expenditures the Debtor claims to have made for his business purposes, notwithstanding that restaurant staff do not provide patrons receipts for tips.

The oft-cited *Sethi* factors, *see Sethi*, 250 B.R. at 838 (quoting *Krohn v. Frommann* (*In re Frommann*), 153 B.R. 113, 117 (Bankr. E.D.N.Y. 1993)), lead to the same conclusion that the failure is not justified.[10] First, the Debtor's business was not so complicated or voluminous so as

---

[10] The *Sethi* factors are:

1. Whether the debtor was engaged in business, and if so, the complexity and volume of the business;
2. The amount of the debtor's obligations;
3. Whether the debtor's failure to keep or preserve books and records was due to the debtor's fault;
4. The debtor's education, business experience and sophistication;
5. The customary business practices for record keeping in the debtor's type of business;
6. The degree of accuracy disclosed by the debtor's existing books and records;
7. The extent of any egregious conduct on the debtor's part; and
8. The debtor's courtroom demeanor.

*Sethi*, 250 B.R. at 838 (quoting *Frommann*, 153 B.R. at 117).

to make the maintenance of adequate records unduly burdensome, and the same records may have provided the Debtor with significant tax advantages. *See In re Berg*, 407 B.R. 167, 176 (Bankr. E.D. Pa. 2009) (citing 26 U.S.C. § 6001; 26 C.F.R. § 1.6001–1) ("[A] taxpayer must keep records to substantiate the amount of his deductions [for business expenses].").[11] The Debtor testified at trial that his accountant advised him of the need to keep records of his business-related cash expenditures in order to claim tax deductions for them, but that chose not to start such recordkeeping and take advantage of the same. It is neither reasonable nor equitable that the Debtor should be discharged from his obligations to creditors without the level of recordkeeping that the reasonable small businessperson would take in order to afford themselves of potentially significant tax deductions.

Second, but for the Judgment of $645,558.96, the Debtor had very little in the way of other debts. In addition to a small amount of credit card debt, the only other obligations owed by the Debtor was a long-defaulted student loan and a loan from his family. The Debtor did not have a mortgage, car loan, or any other form of secured debt. The Debtor's schedules in this case reflect a monthly surplus of over $3,000.00 and a standard of living at or above a middle-class level. By not paying towards the Judgment, the Debtor was able to maintain both his budget surplus and standard of living. It was also clear at trial that but-for the Judgment and the collection efforts of MoSex, the Debtor would not have filed this case. Given the relative sizes of the Judgment, the Debtor's income, and his expenses, a proffered justification for inadequate recordkeeping must be

---

[11] If a taxpayer does not have the actual requisite records, she may provide an estimate of her business deductions if there is "sufficient evidence in the record to provide a basis for the estimate." *In re Berg*, 407 B.R. 167, 176 (Bankr. E.D. Pa. 2009) (quoting *Kolbeck v. Comm'r of Internal Revenue*, T.C. Memo. 2005-253, 2005 WL 2848030, at *2 (T.C. Oct.31, 2005).

particularly compelling in order for a discharge without these records to be reasonable and to be equitable to MoSex and the Debtor. The Debtor's proffer here is far from compelling.

Third, the Debtor's failure to document his records was an affirmative choice he made – admitting at trial that he knew receipts would provide a basis for certain tax breaks, but that he just decided it was too much work. Unlike cases where a fire, data breach, etc. destroys existing records, *see, e.g.*, *Sethi*, 250 B.R. at 840; *Wiess*, 132 B.R. at 592, the Debtor simply chose to never create any records. Fourth, the Debtor has had significant education and is sophisticated in his business. He is a dual-Ivy League graduate, with a master's degree in real estate development, and his CV includes multiple executive-level positions. It is reasonable to expect that someone with a similar background would be aware of the importance of being able to account for the ATM cash, and it is clear that someone with the Debtor's credentials would have the capability to maintain such records.

Fifth, while the record is lacking as to the typical business records kept in the Debtor's field, this Court notes the typical consultant in this field could not possibly possess less than *no records*[12] and therefore this factor, at best, is neutral. Relatedly, while the Court accepts the Debtor's position that restaurant staff do not customarily provide receipts for tips, the Court does not find it credible that the Debtor spent the majority of the withdrawn ATM cash on such tips, and notes that the Debtor could and should have maintained his own contemporaneous records for transactions where the receiving party would not typically provide a receipt. Further, it would be reasonable for a similar business to keep at least those records necessary to support relevant tax deductions. *See Meridian Bank v. Alten*, No. 89–2988, 1991 WL 333927, at *4 (D.N.J. Mar. 28,

---

[12] *See Strbac*, 235 B.R. at 885 (finding "no justification for the total absence of records relating to [the debtor's subcontracting work.]").

1991) (citing *United Bank of Denver v. Greenwalt* (*In re Greenwalt*), 63 B.R. 555, 560 (Bankr. D. Colo. 1986)), *aff'd*, 958 F.2d 1226 (3d Cir. 1992).

Sixth, the degree of accuracy of the Debtor's records is inapplicable because the Debtor testified that he did not keep records of his disposition of ATM cash. Seventh, this Court does not find the Debtor's conduct to be "egregious" as the Court has not found evidence to that effect. Examples of such conduct would include fraud, *see Cacioli*, 463 F.3d at 235, and lack of cooperation during bankruptcy proceedings, *see Johnson*, 387 B.R. at 739. Lastly, the Debtor's courtroom demeanor cuts against him. *See Cacioli*, 463 F.3d at 235. While the Debtor was *selectively* forthcoming with his testimony, he was markedly vague when it came to his ATM withdrawals. As noted above, the Debtor appeared credible when discussing facts that did not implicate the actual cash withdrawn and in his pocket. It was only when the discussion turned to where the cash was spent that his credibility evaporated. In testimony, the Debtor was only able to offer vague generalities and implied that his spending (and lack of saving) habits were the product of his life choices, and simply the way he lived. The Court finds that the Debtor's vague answers as to the ultimate disposition of the cash withdrawn from his bank account are ultimately insufficient and not credible. The Court similarly finds that it would be inequitable for creditors to have the Debtor's obligations discharged based on those answers.

The Debtor has failed to provide a justification other than "I just didn't want to" for not maintaining adequate records for the disposition of the $200,000.00 of cash withdrawn from ATMs pre- and post-petition. Overall, the Court's consideration of the *Sethi* factors confirms its finding that this justification is not reasonable, and that it would be inequitable to MoSex for the Court to find that a lesser duty of recordkeeping was justified in light of all of the circumstances here.

## IV.    Conclusion

In light of the foregoing reasons, this Court finds that: (1) the Debtor failed to keep or preserve recorded information from which the Debtor's financial condition or business transactions might be ascertained, and (2) such failure was not justified. Thus, the Court will deny the Debtor a discharge pursuant to § 727(a)(3). This opinion constitutes the Court's findings and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. The Court will issue a separate order consistent with this opinion.

[signed and dated above]

Copy to: All counsel of record